### UNITED STATES DISTRICT COURT

### DISTRICT OF NEVADA

_____

|  |  |  |
|---|---|---|
| NAME INTELLIGENCE, INC. et al., | ) ) | |
| Plaintiffs, | ) ) | No.: 2:10-cv-01202-RCJ-GWF |
| vs. | ) ) | |
| LAUGHLIN MCKINNON et al., | ) ) | **ORDER** |
| Defendants. | ) ) ) | |

_____

This case arises out of a real estate investment agreement. Plaintiffs allege that Defendants have absconded with the money Plaintiffs gave them to invest on their behalf. Defendants have filed separate Counterclaims. Pending before the Court is Plaintiffs' motion for partial summary judgment as to the counterclaims for defamation and punitive damages. For the reasons given herein, the Court grants the motion. Also pending before the Court are Plaintiffs' motion for attorney's fees and costs, which the Court denies, and Defendant Charles Lybarger's motion to set aside entry of default, which the Court grants.

## I.     FACTS AND PROCEDURAL HISTORY

On or about April 26, 2010, Defendant Lauchlin McKinnon contacted Plaintiff Jay Westerdal, the cofounder, CEO, and President of Plaintiff Name Intelligence, Inc. ("NI"), about a business venture ("the Business") to invest in foreclosed real estate in Las Vegas, Nevada.

(Compl. 3, ECF No. 1).  Westerdal and McKinnon met in Mercer Island, Washington on May 21, 2010 and agreed to proceed with the following business plan: (1) NI would provide initial funds; (2) McKinnon and Defendant Jeff Ehlert would use the funds to purchase real property at foreclosure sales; (3) McKinnon and Ehlert would rehabilitate and resell the properties at a profit; and (4) 75% of profits would go to NI and 25% would go to McKinnon. (*Id.* 3–4). McKinnon promised a 40% return on investment. (*Id.* 4).

On or about June 1, 2010, Plaintiffs provided McKinnon and Ehlert with $700,000 in cashier's checks, and between June 3 and June 8, 2010 McKinnon and Ehlert purchased seven pieces of real property in Las Vegas, Nevada. (*Id.*).  On June 10, 2010, in response to a June 7, 2010 request from McKinnon, Plaintiffs provided McKinnon and Ehlert with an additional $1 million in cashier's checks, which Plaintiffs believe McKinnon and Ehlert used to purchase more properties. (*See id.* 4–5).

On or about June 15, 2010, Defendants ceased communications with Plaintiffs, and despite Plaintiffs' directions to Defendants to cease operating with the capital Plaintiffs provided, Plaintiffs believe Defendants continued to operate with Plaintiffs' funds or the proceeds thereof. (*Id.* 5).  Defendants have refused to return the capital. (*Id.*).  Plaintiffs believe that some of the properties purchased do not exist or were purchased under a name other than Name Intelligence or the Business. (*See id.*).  Plaintiffs believe most or all of their funds were commingled, rather than separated by single-purpose LLC, or were placed into the attorney trust account of Defendant Charles Lybarger, who represents the Business, McKinnon, and/or Ehlert. (*See id.* 5–6).  Plaintiffs believe that Lybarger has since distributed the funds to McKinnon and Ehlert. (*See id.* 6).

1    Plaintiffs sued Defendants in diversity in this Court on five causes of action: (1) breach of

2    contract; (2) breach of fiduciary duties; (3) accounting; and (4)–(5) violation of the Securities

3    Act of Washington, Wash. Rev. Code ("WRC") section 21.20.140. (*See id.*).  The Court granted

4    a preliminary injunction against Defendants' further disposition of Plaintiffs' funds or real

5    property acquired therewith.  Two days before the Court denied Defendants' motions to dismiss

6    for lack of jurisdiction, Plaintiffs filed the First Amended Complaint ("FAC").  The FAC added a

7    sixth cause of action to quiet title to the thirteen properties (the "Properties") allegedly purchased

8    with Plaintiffs' funds.  Plaintiffs presumably did this to bring the Properties within the Court's in

9    rem jurisdiction, and Defendants within the Court's quasi in rem jurisdiction, should the Court

10   have ruled there was no in personam jurisdiction over Defendants in Nevada.  The FAC omitted

11   Lybarger as a Defendant, and Plaintiffs had already voluntarily dismissed Lybarger without

12   prejudice. (*See id.*).  Defendants stipulated to permit Plaintiffs to file the Second Amended

13   Complaint ("SAC").  The SAC added Michael Vannozzi (the broker as to transactions

14   concerning seven of the Properties) as a Defendant and sought to hold him vicariously liable

15   under a seventh cause of action based upon Ehlert's actions. (*See id.* 11–12).  Plaintiffs then filed

16   a motion to amend the SAC, which the Court granted.  The Third Amended Complaint ("TAC")

17   names Lybarger as a Defendant and seeks to hold him and others liable for conversion under the

18   newly added eighth cause of action.

19   On August 10, 2011, Ehlert filed his Counterclaim listing five causes of action: (1)

20   breach of contract; (2) breach of implied covenant of good faith and fair dealing; (3) quantum

21   meruit; (4) defamation; and (5) declaratory relief.  On August 11, 2011, McKinnon filed a

22   separate Counterclaim listing six causes of action: (1) breach of contract; (2) breach of implied

23   covenant of good faith and fair dealing: (3) breach of fiduciary duty; (4) quantum meruit; (5)

24

1  declaratory relief; and (6) injunctive relief.  Plaintiffs have filed a motion for partial summary

2  judgment as to Ehlert's counterclaim for defamation and Ehlert's and McKinnon's counterclaims

3  for punitive damages.  Ehlert filed a limited opposition.  Ehlert does not oppose the motion as to

4  his counterclaims for defamation and punitive damages but denies conceding the alleged

5  existence of a partnership between himself and McKinnon.  McKinnon filed a separate

6  opposition.

7  **II.**    **LEGAL STANDARDS**

8       **A.**    **Rule 56**

9       Summary judgment is appropriate when, viewing the facts in the light most favorable to

10  the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact

11  and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Oak*

12  *Harbor Freight Lines, Inc. v. Sears Roebuck, & Co.*, 513 F.3d 949, 954 (9th Cir. 2008).  Factual

13  materiality is driven by the substantive law's determination of which facts are critical to the

14  elements of the claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If reasonable

15  minds could differ on the material facts at issue, then a genuine dispute exists and summary

16  judgment is not appropriate. *See id.* at 250–51.  A court does not weigh the evidence or

17  credibility of witnesses in making this determination. *Horphag Research Ltd. v. Garcia*, 475

18  F.3d 1029, 1035 (9th Cir. 2007).

19       The moving party has the initial burden of informing the court how the pleadings and

20  pre-trial discovery "demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*

21  *v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party also has the burden of proof at trial,

22  then they must establish the absence of material fact for each element of their case. *C.A.R.*

23  *Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations

24

omitted).  Conversely, if the nonmoving party bears the burden of proof at trial, then the moving party can meet its initial burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323–24.

Once the moving party meets its initial burden, the nonmoving party must set forth facts beyond the assertions and allegations of the pleadings and demonstrate a genuine issue for trial. *Id.* at 324; *Horphag*, 475 F.3d at 1035.  The nonmoving party sufficiently demonstrates a genuine issue for trial when it shows that a jury or judge is required to resolve the dispute. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  A court draws all justifiable inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 255.  But if the nonmovant's evidence is merely colorable or is not significantly probative, summary judgment may nevertheless be granted. *See id.* at 249–50.

**B.     Rule 55(c)**

Under Rule 55(c), a court may set aside an entry of default for "good cause shown."  In general, a more lenient standard is applied when determining whether to set aside an entry of default than is applied to vacating a default judgment. *See Mendoza v. Wight Vineyard Mgmt.*, 783 F.2d 941, 945 (9th Cir. 1986) (per curiam) ("The court's discretion is especially broad where . . . it is entry of default that is being set aside, rather than a default judgment").  When exercising its discretion under Rule 55, the court's "underlying concern . . . is to determine whether there is some possibility that the outcome of the suit after a full trial will be contrary to the result achieved by the default." *Hawaii Carpenters' Trust Funds v. Stone*, 794 F.2d 508, 513 (9th Cir. 1986).  The overriding judicial goal of deciding cases correctly on the merits is to be

1    balanced with the interests of both litigants and the courts in the finality of judgments. *See Pena*

2    *v. Seguros La Comerical*, 770 F.2d 811, 814 (9th Cir. 1985).  The Court considers the following

3    factors when deciding whether to set aside the entry of default:  (1) whether the defendant's

4    culpable conduct led to the default; (2) whether the defendant has a meritorious defense; and (3)

5    whether reopening the default would prejudice the plaintiff. *See TCI Group Life Ins. Plan v.*

6    *Knoebber*, 244 F.3d 691, 696 (9th Cir. 2001).  The party seeking to invoke Rule 55(c) bears the

7    burden of demonstrating that these factors favor setting aside the default. *See id.*

8    **III.    ANALYSIS**

9         **A.    Counterclaims by Jeff Ehlert**

10        Ehlert does not oppose Plaintiffs' motion for partial summary judgment.  Therefore, the

11   court grants Plaintiffs' motion as to Ehlert's defamation and punitive damage counterclaims.

12        **B.    Counterclaim by Lauchlin McKinnon**

13        The remaining counterclaim at issue is McKinnon's counterclaim for punitive damages.

14   The prayer for punitive damages is not a separate cause of action.  Rather, the Court must

15   examine whether this measure of damages is available under any of the substantive

16   counterclaims.  McKinnon's substantive counterclaims include: (1) breach of contract; (2)

17   tortious breach of the implied covenant of good faith and fair dealing; and (3) breach of fiduciary

18   duty.

19        **1.    Breach of Contract**

20        In Nevada, punitive damages may be awarded in an action "not arising from contract,

21   where it is proven by clear and convincing evidence that the defendant has been guilty of

22   oppression, fraud or malice, express or implied . . . ." Nev. Rev. Stat. § 42.005(1).  An ordinary

23   breach of contract claim will not support punitive damages under the statute. *Great Am. Ins. Co.*

24

1    *v. Gen. Builders, Inc.*, 934 P.2d 257, 263 (Nev. 1997) (citing *id.*).  Therefore, the court grants the

2    motion for summary judgment as a matter of law as to the breach of contract counterclaim.

3            **2.      Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing**

4            Although punitive damages are available under Nevada law for a tortious (as opposed to

5    a contractual) breach of the implied covenant of good faith and fair dealing, this cause of action

6    is limited "to those cases involving special relationships characterized by elements of public

7    interest, adhesion, and fiduciary responsibility." *Id.* (citing *K Mart Corp. v. Ponsock*, 732 P.2d

8    1364, 1364 (Nev. 1987)).  This type of relationship ordinarily arises out of insurance contracts,

9    as "the covenant of good faith and fair dealing is implicit in every insurance contract." *Bergerud*

10   *v. Progressive Cas. Ins.*, 453 F. Supp. 2d 1241, 1246 (D. Nev. 2006) (Pro, C.J.).  No such

11   relationship exists here.  Therefore, the Court grants the motion for summary judgment as a

12   matter of law as to this counterclaim.

13           **3.      Breach of Fiduciary Duty**

14           McKinnon alleges that Plaintiffs engaged in a calculated scheme to steal his and Ehlert's

15   foreclosed-property buying methodology.  McKinnon alleges that after he purchased thirteen

16   properties and was preparing them for sale, Westerdal leveraged his position as the capital

17   provider and demanded that McKinnon reduce his share of the profits.  When McKinnon and

18   Ehlert rejected the new terms, Westerdal instructed them to cease all operations.  McKinnon

19   concludes that Plaintiffs thereby violated their fiduciary duties to McKinnon.

20           The agreement between Plaintiffs and Defendants appears to be a joint venture.  In

21   Nevada, "[a] joint venture is a contractual relationship in the nature of an informal partnership

22   wherein two or more persons conduct some business or enterprise, agreeing to share jointly, or in

23   proportion to capital contributed, in profits and losses." *Bruttomesso v. L.V. Metro. Police Dep't*,

24

591 P.2d 254, 256 (Nev. 1979).  "A joint venture is a less formal relationship than a partnership and is typically an association entered into to perform a more limited business objective for a more brief period of time." *Hook v. Giuricich*, 823 P.2d 294, 296 (Nev. 1992).  Here, the business agreement was limited and intended to last for a brief period of time.  Therefore, the Court considers that the agreement to have been a joint venture.

Like partners, joint venturers owe a fiduciary duty to one another. *Leavitt v. Leisure Sports Inc.*, 734 P.2d 1221, 1224 (Nev. 1987).  "[I]t is well established that when a fiduciary duty exists between the parties, and the conduct complained of constitutes a breach of that duty, the claim sounds in tort regardless of the contractual underpinnings." *Clark v. Lubritz*, 944 P.2d 861, 866 (Nev. 1997) (quoting *Wash. Med. Ctr. v. Holle*, 573 A.2d 1269 (D.C. Ct. App. 1990)). Therefore, while punitive damages cannot stem from contractual breaches, the breach of fiduciary duty is a separate tort upon which punitive damages may be based. *See id.* at 867. However, "[t]he injuries must be entirely separate from those suffered because of breach," otherwise there is a danger of tacking punitive damages onto contract claims. *Id.* (quoting *Nissho-Iwai Co., Ltd. v. Occidental Crude Sales*, 729 F.2d 1530 (5th Cir. 1984)).

Still, a breach of fiduciary duty in a joint venture results only where a joint venturer absconds with some asset of the joint venture, such as a piece of property or a trade secret. McKinnon has not alleged that Plaintiffs absconded with anything, but only that they refused to continue in the joint venture after some disagreements. *See infra*.  As such, he cannot prove a breach of fiduciary duty at all, and the Court grants summary judgment on that counterclaim altogether.

Even if the counterclaim survived, Plaintiffs argue that there is no clear and convincing evidence that they acted with malice, fraud, or oppression.  Under section 42.001(3), "express

malice" is "conduct which is intended to injure a person," and "implied malice" is "despicable conduct which is engaged in with a conscious disregard of the rights . . . of others."  A claim for punitive damages requires evidence that the defendant acted with a culpable state of mind and that the conduct exceeded mere recklessness or gross negligence. *Countrywide Home Loans, Inc. v. Thitchener*, 192 P.3d 243, 255 (Nev. 2008).

McKinnon supports his allegations with the deposition testimony of Westerdal.[1]  (*See* Westerdal Dep., Feb. 21, 2012, ECF No. 131-1, at 51).  McKinnon has not provided evidence creating a genuine issue of material fact on whether Westerdal is guilty of fraud, malice, or oppression.  According to Westerdal's testimony, the original joint venture was for NI and McKinnon to share the profits 75% and 25%, respectively, with no risk of loss for McKinnon, and that Ehlert was not a part of the joint venture, although McKinnon apparently had a separate agreement with Ehlert. (*See id.* 49:11–19, 123:18–22, 127:19–128:3, 154:3–7).  Westerdal later proposed to McKinnon that the original joint venture continue as agreed, but that if they intended to purchase more houses with NI's capital, that NI, McKinnon, and Ehlert should share in the profits and losses 80%, 10%, and 10%, respectively. (*See id.* 155:14–156:19).  McKinnon "probably" did not agree to this. (*Id.* 171:23–25).  When asked whether he told McKinnon to stop operations on the existing joint venture due to McKinnon's refusal to enter into the new agreement under the terms proposed, Westerdal answered that he told McKinnon and Ehlert to stop operations on the original joint venture because of an ongoing dispute over a 3% realtor's commission. (*See id.* 172:1–173:25).  McKinnon has provided no evidence that Westerdal withdrew from the joint venture on behalf of NI because of McKinnon's refusal to enter into the new agreement.  All of the evidence adduced indicates that Westerdal withdrew because of a

---

[1] McKinnon also attaches many email exchanges, but those only tend to support Plaintiff's allegations.  Only the deposition excerpts tend to support McKinnon's allegations.

dispute over the realtor's fee and because McKinnon ceased all communications with Westerdal and told him to contact his attorney. (*See* Resp. Ex. A (emails), ECF No. 131-1, at 20–49). McKinnon has failed to provide any evidence supporting a punitive damages claim. Therefore, the Court grants Plaintiffs' motion for summary judgment as to McKinnon's counterclaim for punitive damages.

### C.   Motion for Attorney's Fees and Costs

Plaintiffs ask for fees and costs against Lybarger as sanctions under 28 U.S.C. § 1927 and the Court's inherent powers. Plaintiffs argue that Lybarger's recent motion to dismiss the conversion claim against him was frivolous. They also note that Lybarger both failed to cite Nevada Rule of Professional Conduct 1.15(e) (a controlling piece of law directly adverse to his position) and to attend the hearing on his motion, without excuse.

The Court will not award sanctions at this time. Section 1927 permits a court to order a party to satisfy another party's costs or fees incurred because the first party has "multiplie[d] the proceedings in any case unreasonably and vexatiously." Although Lybarger's motion was without merit and he failed to attend the hearing, his conduct did not rise to the level of vexatiousness. Also, there was no abuse of the judicial system here or bad faith evident in the motion to dismiss that would support sanctions under the Court's inherent powers. *See, e.g.*, *Toombs v. Leone*, 777 F.2d 465, 471 (9th Cir. 1985) (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980)).

### D.   Motion to Set Aside Entry of Default

The Clerk entered default against Lybarger on August 2, 2012 based upon his failure to answer the February 24, 2012 TAC. Lybarger argues that his conduct was not culpable because his prior counsel, Attorney Arin, informed him that she would withdraw and would therefore not

1    file an answer on his behalf.  Plaintiff claims that Attorney Arin informed him on July 29, 2012

2    that she had received a notice of intent to enter default and that he had until August 1, 2012 to

3    file an answer.  He therefore planned to file an answer on that date.  But he did not.  Instead,

4    Plaintiffs applied to the Clerk for an entry of default on that date.  Lybarger emailed Plaintiffs'

5    counsel to request that they withdraw the application, but opposing counsel did not respond.

6    Lybarger then filed his Answer on August 1, 2012, but the Clerk entered default on August 2,

7    2012.

8             Next, Lybarger argues that he has a meritorious defense.  He essentially argues that there

9    was a legitimate dispute over who owned the funds entrusted to him by his co-Defendants and

10   that it is therefore not clear he is liable for conversion for transferring some of those funds to

11   himself.  He argues that if it is in fact true that Ehlert or McKinnon were partners with NI, then

12   they had the authority to dispose of the partnership's funds as they saw fit.  The Court rules that

13   there is a meritorious defense.  Westerdal will apparently testify that he informed Lybarger that

14   the funds were his alone.  Still, knowledge of the ownership of the funds is relevant only to

15   punitive damages.  It is not relevant to compensatory damages for conversion.  The right of

16   Lybarger to dispose of the funds as commanded by Ehlert or McKinnon has not yet been

17   determined, and Lybarger may have a meritorious defense.

18            Finally, Lybarger argues that reopening the default would not prejudice Plaintiffs,

19   because it will not impede their ability to pursue their claims.  Lybarger is correct.  There is no

20   indication that evidence will be lost or discovery made more difficult by setting aside the default.

21   Lybarger moved to set aside the default only ten days after it was entered.

22   ///

23   ///

24

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion for Partial Summary Judgment (ECF No. 121) is GRANTED.

IT IS FURTHER ORDERED that the Motion for Attorney's Fees and Costs (ECF No. 138) is DENIED.

IT IS FURTHER ORDERED that the Motion to Set Aside Entry of Default (ECF No. 142) is GRANTED.

Dated:  This 2nd day of October, 2012.

_____
ROBERT C. JONES
UNITED STATES DISTRICT JUDGE